CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 15 2020

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

IN RE:  DePUY ORTHOPAEDICS, INC. PINNACLE
HIP IMPLANT PRODUCTS LIABILITY
LITIGATION

Civil Action No.  4:20-cv-00006

Related Case: *IN RE: DePUY*
*Orthopaedics, Inc., Pinnacle Hip*
*Implant Products Liability Litigation,*
*3:11-md-02244*

 MDL 2244

MATTHEW J. LAIRD

        Plaintiff,

v.

DePUY ORTHOPAEDICS, INC.,

and

DePUY, INC.,

and

JOHNSON & JOHNSON SERVICES, INC,

 and

JOHNSON & JOHNSON,

and

DePUY INTERNATIONAL LIMITED,

        Defendants.

## <u>COMPLAINT AND REQUEST FOR JURY</u>

        1.        This case arises from a defective hip implant manufactured by Defendants.

2.      Plaintiff, Matthew J. Laird, was injured by Defendants' defective hip implant and seeks recovery for his bodily injuries, lost wages, physical and mental pain, past and future medical expenses, past and future pain and suffering, increased risk of future harm and permanent injury.

3.      Plaintiff is a citizen of Virginia, residing in Charlotte County, which is located within the jurisdiction of the United States District Court for the Western District of Virginia.

4.      DePuy Orthopaedics, Inc. is a corporation organized and existing under the laws of the state of Indiana and it maintains its principal place of business in Warsaw, Indiana. Upon information and belief, DePuy Orthopaedics is a subsidiary of DePuy, Inc.

5.      DePuy, Inc. is a corporation organized and existing under the laws of the state of Delaware and it maintains its principal place of business in Warsaw, Indiana. DePuy, Inc. is a subsidiary of Johnson & Johnson.

6.      Johnson & Johnson is a corporation organized and existing under the laws of the State of New Jersey and it maintains its principal place of business in New Brunswick, New Jersey. Johnson & Johnson is the parent company of DePuy, Inc. and Johnson & Johnson Services, Inc.

7.      Johnson & Johnson Services, Inc. is a corporation organized and existing under the laws of the state of New Jersey and it maintains its principal place of business in New Brunswick, New Jersey.  Johnson & Johnson Services, Inc. is a subsidiary of Johnson & Johnson.

8.      Upon information and belief, Defendant DePuy International Limited is a foreign corporation, and a citizen of the United Kingdom, with its principal place of business located at St. Anthony's Road, Leeds, LS11 8DT, England.

9.      At all times relevant, DePuy International Limited, was engaged in the business of designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce in the United States, either directly or indirectly, through third parties or related entities, numerous orthopaedic products, including certain components of the DePUY Pinnacle Hip System also called the Pinnacle Device.

10.      Unless indicated otherwise, all of the Defendants shall hereinafter be referred to collectively as DePuy or Defendants.

11.      At all times relevant herein, Defendants developed, manufactured, advertised, promoted, marketed, sold and/or distributed the defective DePuy products in the United States.

12.      At all times relevant herein, Defendants were the agents, ostensible agents, coconspirators, servants, employees, partners, joint venturers, franchisees and/or alter egos of one each individual Defendant and each Defendant was at all times and places mentioned herein acting within the course and scope of such conspiracy, service, agency, employment, partnership, joint venture and/or franchise.

13.      This Court has jurisdiction over all causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have their principal place of business in States and foreign states other than the state in which the named Plaintiff resides.

14.    Defendants have had continuous and systematic contacts with the Commonwealth of Virginia sufficient enough to establish general jurisdiction over said Defendants.

15.    The causes of action alleged herein arose from or relate to the contacts of Defendants to the Commonwealth of Virginia, thereby conferring specific jurisdiction with respect to said Defendants.

16.    The assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

17.    This Court has supplemental jurisdiction over the remaining common law and state law claims pursuant to 28 U.S.C. § 1367.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred, in part, in the Western District of Virginia, and because Defendants conduct substantial business in this District.  Charlotte County, where Plaintiff resides, is furthermore part of the Western District of the United States District Court for Virginia, in the Danville Division.

19.    Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claim occurred within this judicial district and the Defendants regularly conduct business in this District.

20.    This Court has personal jurisdiction over the Defendants pursuant to Virginia's long arm statute.

21.     Joinder of all claims is allowed pursuant to Federal Rule of Civil Procedure 20(a) (l) because Plaintiffs right to relief arose out of the same transaction, occurrence, or series of

transactions or occurrences. Additionally, there are questions of law and/or fact common to all Plaintiffs and all Defendants.

## I. FACTUAL BACKGROUND

### A. METAL-ON-METAL TOTAL HIP REPLACEMENT SYSTEMS

22. A natural hip is composed of a femoral head (a rounded bone on top of the thigh bone) that rotates within the acetabulum (a socket located at the outer edge of the pelvis).

23. Total hip replacement surgery replaces the natural femoral head and acetabulum with an artificial head and cup system.

24. The first total hip replacement systems were metal-on-metal systems and came into use between 1960 and 1975.

25. These metal-on-metal systems often failed and were replaced decades ago by implants composed of metal-on-polyethylene or other synthetic components.

26. Manufacturers generally market their metal-on-synthetic hip implants as having a 10-12-year useful wear life. After the useful wear life expires, the hip replacement system may need to be removed and replaced. Because of the limited durability of metal-on-synthetic systems, younger patients in need of hip replacement surgery were historically often encouraged to delay hip replacement so that the need for a secondary replacement surgery could be reduced.

27. In an effort to increase revenues, hip implant manufacturers began in the late 1990's to aggressively market hip implant surgery to a younger and more active demographic. As part of this marketing effort, Defendants resurrected the previously abandoned metal-on metal total hip replacement systems, marketing them as much more durable and longer performing "second generation" devices. Unfortunately, these "second generation" metal-on-metal hip

implants (including the Pinnacle Device which is the subject of this lawsuit) pose the same unreasonable dangers and health risks that caused the manufacturers to abandon the "first generation" decades before.

28.     The Pinnacle Device is made up of four components: the metal femoral stem is inserted inside the femur bone, the metal femoral head (or ball) connects to the top of the stem and then makes contact with a liner that is attached to the interior portion of the metal acetabulum cup (socket).   The acetabulum cup is comprised of titanium metal on its outer shell. A plastic, ceramic, or cobalt-chromium metal liner is then placed on the inside of the acetabulum cup.  The metal femoral head rotates within the plastic, ceramic, or metal liner.   The cobalt chromium metal liner is branded by Defendants as the "Ultamet."  The Pinnacle Device with an Ultamet liner is a "metal-on-metal" device due to the fact that both articulating surfaces --the femoral head (ball) and acetabulum liner (socket)--are comprised of cobalt-chromium metal. Ultamet liner is a "metal-on-metal" device due to the fact that both articulating surfaces --the femoral head (ball) and acetabulum liner (socket)--are comprised of cobalt-chromium metal.

**B.    DANGEROUS METAL-ON-METAL HIP REPLACEMENTS**

**MARKETED WITHOUT TESTING**

29.     Defendants' "second generation" metal-on-metal total hip replacement systems, including the Pinnacle Device that is the subject of this lawsuit, are classified by the Medical Device Amendments to the Food, Drug and Cosmetics Act of 1938  ("MDA") as Class III medical  devices  by the United States Food and Drug Administration ("FDA").

30.     A medical device is classified as Class III in part because it poses potentially unreasonable risks to patients.

31.     The MDA requires all Class III medical devices to undergo a rigorous premarket approval process, a process which obligates the manufacturer to design and implement a clinical investigation and to submit the results of that investigation to the FDA.

32.     Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multi volume application.  The application must include reports of all studies of the device's safety and effectiveness and a full statement of the device's components, ingredients, properties and principles of operation.  The application must also include a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, packing and installation of, samples or device components.

33.      Unlike earlier metal-on-metal total hip replacement systems, the Pinnacle Device completely bypassed this rigorous premarket approval testing process.  In fact, Class III FDA approval was never granted before Defendants sold and implanted the Pinnacle Device into thousands of patients.

34.      A medical device on the market prior to the effective date of the MDA- a so-called "grandfathered" device - was not required to undergo premarket approval. In addition, a medical device marketed after the MDA's effective date may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device. This exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least ninety (90) days prior to the device's introduction into the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then approve the new device for sale in the United States.

35.     The Pinnacle Device was certified to be sold on the basis of Defendants' claim that it was "substantially equivalent" to another older metal-on-metal hip implant device that Defendants sold and implanted prior to the enactment of the MDA in 1976.

36.     Under the 510(k) process Defendants were able to market and sell the Pinnacle Device with virtually no testing or FDA review of the implant for safety and effectiveness.

## C.     KNOWN DANGERS OF THE DEPUY METAL-ON-METAL HIP REPLACEMENTS

37.     Had Defendants conducted clinical trials of the Pinnacle Device before it was released on the market in the early 2000's they would have learned that the Pinnacle Device has a high failure rate.  When the Pinnacle Device fails it releases metal particles into the patient's surrounding tissue when the cobalt-chromium metal femoral head rotates within the cobalt-chromium metal acetabular liner.

38.      Particles released by friction of the metal-on-metal surfaces results in metallosis, biologic toxicity, tissue death and the growth of pseudotumors and cause infection, inflammation, severe pain, loss of mobility, bone loss and death of the surrounding tissue.

39.      This friction, referred to in the industry as "edge wear" or "edge loading", is especially pronounced in the early "wear in" period.

40.     The FDA has received well over 1000 adverse reports regarding problems associated with or attributed to the Pinnacle Device.

41.     Due to the design of the Pinnacle Device, proper placement is difficult for even experienced surgeons.  Without near perfect placement, the problems of edge wear and edge loading are exacerbated making metallosis more severe and early failure even more common.

**D.    DEFENDANTS RECALL NEWER "SUBSTANTIALLY  EQUIVALENT" DEPUY METAL-ON-METAL TOTAL HIP REPLACEMENT**

42.    In December 2009, the DePuy ASR metal-on-metal total hip replacement system was withdrawn from the Australian market due to its high failure rate. The defective DePuy ASR model is prone to early failure and causes metallosis and cobalt toxicity resulting in serious health problems.

43.    In August 2010, Defendants acknowledged this high failure rate and recalled more than 90,000 DePuy ASR metal-on-metal total hip replacement systems worldwide.

44.    The recalled DePuy ASR model was never FDA approved through the rigorous application process.  Instead, it received 510(k) certification only after Defendants claimed that it was "substantially equivalent" to the earlier defective DePuy metal-on-metal total hip replacement systems.

45.    Defendants, however, continued to sell the Pinnacle Device to doctors who implant them in countless numbers of patients.

**E.    DOCTORS ACKNOWLEDGE DANGERS OF METAL-ON-METAL TOTAL HIP REPLACEMENTS**

46.    Leading orthopedic surgeons in the United States have virtually stopped using metal-on-metal hip implants because a significant percentage of patients who receive these Implants experience early failure, dislocation and disarticulation.  Many patients also suffer severe tissue loss and irreversible bone damage.

47.    The Medicines and Healthcare products Regulatory Agency ("MHRA")  in Britain investigated Defendants' metal-on-metal total hip replacement system after receiving

widespread reports of soft tissue reactions and tumor growth in thousands of patients who had received these implants. MHRA required doctors to establish a system to closely monitor patients known to have metal-on-metal artificial hips by monitoring the cobalt and chromium ion levels in their blood and to evaluate them for related soft tissue reactions.

48.    Because of the problems associated with the need for almost perfect positioning of the implants and because of demonstrated premature and excessive wear, the Journal of Arthroplasty issued a statement urging doctors to use any metal-on-metal hip replacement only with "great caution, if at all."

49.    The Alaska Department of Health recently issued a bulletin warning of the toxicity of Defendants' metal-on-metal total hip replacement systems. The State of Alaska, like the MHRA, identified the need for close medical monitoring, surveillance and treatment of all patients who had received these and similar metal-on-metal implants.

50.    Despite public knowledge to the contrary, Defendants continue to misrepresent the Pinnacle Device as a high-quality, safe and effective hip replacement product.

F.    **DEFENDANTS HAVE MADE BILLIONS OF DOLLARS DISREGARDING THE PUBLICS' HEALTH AND SAFETY**

51.    Defendants have aggressively marketed metal-on-metal total hip replacement systems despite knowledge of their defects and dangers and without regard to patient safety or suffering.

52.    In fact, the United States Attorney's Office charged Defendants for illegally and aggressively marketing the Pinnacle and other metal-on-metal total hip replacement system by paying hundreds of millions of dollars in unlawful kick-backs to doctors and medical facilities.

53.    Defendants resolved this criminal investigation by agreeing to pay over $80 million in fines and agreeing to end their illegal marketing schemes.

54.    Even when marketed legally, the hip implant business is a huge source of Defendants' revenues. In 2009, Defendants reported more than $5.4 billion in sales.

## G.    PLAINTIFF'S INJURIES & DAMAGES

55.    The Plaintiff is a surgical recipient of the implanted DePuy Pinnacle metal-on-metal total hip replacement system.

56.    After surgery, the known and common problems of natural biologic corrosion and friction wear caused large amounts of toxic cobalt-chromium metal ions and particles to be released into Plaintiff's blood and tissue and bone surrounding the implants.

57.    Plaintiff began experiencing severe pain, discomfort and inflammation in the areas of the implants.  Plaintiff also experienced disarticulation, and/or a slipping feeling in the hip joints and a sensation that the Pinnacle Devices could not support his weight.

58.    Due to Plaintiff's chronic pain and discomfort, Plaintiff underwent revision surgery on January 19, 2018, of his right hip implant.  Plaintiff will continue to suffer additional harmful effects in the future and is at increased risk of additional future harm.

59.    All of the injuries and complications suffered by Plaintiff were caused by the defective design, warnings, manufacturing, and unreasonably dangerous character of the Pinnacle Device.

60.    Had Defendants not misrepresented or concealed the known defects, the early failure rate, the known complications and the unreasonable risks associated with the use of the

Pinnacle Device, Plaintiff would not have consented to the Pinnacle Devices being used in his hip replacement surgeries.

61.     As a result of these defects, Plaintiff has suffered severe pain, limited range of motion of his right hip, limited range of motion of his right hip, difficulty standing or walking, fatigue, tissue inflammation, necrosis and/or metallosis.  Additionally, Plaintiff has endured,  or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation causing damage or death to surrounding bone and tissue; more difficult revision surgery; shortened life of subsequent implants; prolonged recovery time; physical therapy; and an increased risk of complications and/or death from additional revision surgeries.

62.     To the extent that Defendants may claim one or more of Plaintiff's claims are barred by the applicable statute of limitations, Plaintiff asserts the statute of limitations is and has been tolled by Plaintiff's discovery that his injuries were caused by Defendant's defective hip implant products and failure to properly and adequately warn of the product's risks, as more fully detailed in this Complaint.

## II.     CAUSES OF ACTION

## COUNT I - NEGLIGENCE

63.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint and further alleges:

64.     Defendants owed a duty to Plaintiff to use reasonable care in the manufacture, sale and distribution of the Pinnacle Hip. Defendants' proper performance of this duty would have eliminated the risk that the device Defendants distributed and sold would become unsafe for its intended use.  Defendants breached this duty.

65.     Defendants had a duty to properly supervise, train, and monitor its employees, agents, and contractors to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of the Pinnacle Hip, but failed to do so and were therefore negligent.

66.     Defendants had a duty to use supplies and other constituent materials that were reasonably safe, free of defects, and in compliance with applicable federal, state, and local laws ordinances, and regulations.   Defendants breached this duty.

67.     Defendants had a duty to ensure that the Pinnacle Hip it distributed and sold was safe for implantation in the human body.   Defendants failed to do so and were therefore negligent.

68.     Defendants had a duty to exercise reasonable care to sell reasonably safe medical devices so as not to subject the ultimate consumer to unreasonable risk of harm.

69.     Defendants were negligent, reckless, grossly negligent and wanton, and breached its duties, in the manufacture, distribution and sale of the DePuy Pinnacle Hip System in all of the following respects:

a.     By designing, manufacturing, inspecting, marketing, distributing, selling and/or supplying the Pinnacle Hip in such a way that persons using the product would be subjected to unreasonable danger;

b.     By failing to warn (including post sale) hospitals and patients that the Pinnacle Hip was defective;

c.      By placing and/or permitting the placement of the Pinnacle Hip into the

stream of commerce when Defendants knew or should have known the Pinnacle

Hip was defective;

d.       By failing to properly and adequately test and inspect the Pinnacle

 Hip to determine its safety;

e.      By failing to employ corrective safety mechanisms to limit the harm

caused by the Pinnacle Hip;

f.      By manufacturing, inspecting, marketing, distributing, selling

and/or supplying the Pinnacle Hip in an unsafe condition;

g.       By failing to keep abreast of and/or react appropriately to public,

government and/or industry studies, information,  documentation and

recommendations,  consumer complaints and reports and/or information regarding

the Pinnacle Hip;  and

h.      By failing to use due care under the circumstances.

70.     As a direct and proximate result of the Defendants' negligence, carelessness,

recklessness, gross negligence and wantonness, Plaintiff has suffered injury and damages.

## COUNT II - BREACH OF EXPRESS WARRANTY

71.     Plaintiff repeats and incorporates by reference all other paragraph of this

Complaint and further alleges:

72.      Defendants made affirmation of fact or promises through the advertisement,

labeling, marketing, and promotion of its product, the Pinnacle Hip, to health care professionals,

the FDA, Plaintiff and the public, representing that the Pinnacle Hip was safe, effective, fit, and

proper for its intended use in order to induce its purchase or use, thereby making an express

warranty that the Pinnacle Hip would conform to the representations.

73.    Defendants' representations, mentioned above, related to the goods and became

part of the basis of the bargain creating an express warranty that the goods shall conform to the

affirmations of fact or promises.

74.    Defendants' Pinnacle Hip did not conform to their representations that the

Pinnacle Hip was safe, effective, fit, and proper for its intended use.

75.    At all relevant times, Plaintiff used the Pinnacle Hip for the purpose and in the

manner intended by Defendants.

76.    Plaintiff and Plaintiffs physician, by the use of reasonable care, would not have

discovered the breached warranty and realized its danger.

77.    The breach of the warranty was a substantial factor in bringing about Plaintiffs

injuries.

78.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered

injury and Defendants are liable to Plaintiff in an amount to be determined at trial.

## COUNT III - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

79.    Plaintiff repeats and incorporates by reference all other paragraphs of this

Complaint and further alleges:

80.    Defendants were and are merchants with respect to goods, such as the Pinnacle

Hip.

81.    Defendants impliedly warranted to Plaintiff that the Pinnacle Hip was fit for its

ordinary purpose.

82.    Defendants breached the implied warranty of merchantability because the Pinnacle Hip was dangerous and could not safely be used for its ordinary purpose.

83.    Defendants knew or should have known that the Pinnacle Hip did not meet the capabilities as represented and marketed.

84.    At all relevant times, Plaintiff used the Pinnacle Hip for the purpose and in the manner intended by Defendants.

85.    Plaintiff and Plaintiff's physician, by the use of reasonable care would not have discovered the breached warranty and realized its danger.

86.    Defendants' breach of implied warranty was a substantial factor in bringing about Plaintiff's injuries.

87.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered injury and Defendants are liable to Plaintiff in an amount to be determined at trial.

## COUNT IV - BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

88.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint and further alleges:

89.    Defendants knew that the Pinnacle Hip would be implanted and used in patients and that the physicians and patients were relying on its judgment to furnish suitable goods.

90.    Defendants knew or should have known that the Pinnacle Hip did not meet the capabilities as presented and marketed.

91.    At all relevant times, Plaintiff used the Pinnacle Hip for the purpose and in the manner intended by Defendants.

92.    Plaintiff and Plaintiff's physician, by the use of reasonable care would not have discovered the breached warranty and realized its danger.

93.    Defendants' breach of the implied warranty was a substantial factor in bringing about Plaintiff's injuries.

94.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered injury and Defendants are liable to Plaintiff in an amount to be determined at trial.

## COUNT V – FRADULENT CONCEALMENT

95.    Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint and further alleges:

96.    Defendants had a duty to inform Plaintiff of all material facts about the Pinnacle Hip Implants based upon the assumption of that responsibility by representing to consumers that the Pinnacle Hip Implant Devices were safe and effective hip replacement systems.

97.    Since 2009, Defendants have had actual knowledge that the Pinnacle Hip Implant could fail early thereby giving rise to unnecessary pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery.

98.    The fact that the Pinnacle Hip Implant could fail early thereby giving rise to unnecessary pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery was, and is, a material fact.

99.    Defendants failed to disclose this material fact to consumers, including Plaintiff. Instead, Defendants took affirmative steps to prevent physicians and consumers from learning of

this material fact, while aggressively marketing the Pinnacle Hip Implant as safe and effective hip replacement systems.  This concealment was done with the intent to induce Plaintiff and physicians to purchase the Pinnacle Hip Implant Devices and to prevent patients from filing lawsuits seeking damages for the defective Pinnacle Hip Implant.

100.     In reliance on Defendants' fraudulent concealment of a material fact, Plaintiff purchased the Pinnacle Hip Implant devices so that his physician could surgically implant the devices into the Plaintiff.  Had Plaintiff known that the Pinnacle Hip Implant Devices could fail early thereby giving rise to unnecessary physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the devices with the attendant risks of complications and death from such further surgery, she would not have purchased the Pinnacle Hip Implant Devices.

101.     As a result of Defendants' unlawful and fraudulent concealment of the effects of the Pinnacle Hip Implant Devices, the running statute of limitations has been suspended with respect to claims that Plaintiff has brought or could bring.   Plaintiff had no knowledge of the Defendants' unlawful conduct, or of any of the facts that might have led to the discovery of Defendants' wrongdoing, notice of the DePuy ASR, a substantially similar device, was recalled.

102.     As a direct and proximate result of Defendants' fraudulent concealment of the effects of the Pinnacle Implant Devices, Plaintiff has suffered significant damages, including but not limited to physical injury, economic loss, pain and suffering, and the need for further surgery to replace the faulty device, and will continue to suffer such damages in the future.

## COUNT VI- STRICT LIABILITY- FAILURE TO WARN

103.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint and further alleges:

104.     The Pinnacle Hip manufactured and supplied by Defendants was defective due to inadequate warning or instruction because Defendants knew or should have known the product created significant risks of serious bodily harm, and they failed to adequately warn consumers and/or their surgeons of such risks including:

a.     The device contained insufficient warnings to alert consumers and their physicians of the unreasonably high risk of failure once implanted;

b.     Defendants' promotional material, labeling and instructional materials accompanying the Pinnacle Hip were inadequate and misleading to consumers and their physicians;

c.     Even after Defendants received notice from reputable medical sources prior to the sale of the device, the device still presented a high risk of failure and harm to the consumer and yet Defendants knowingly and deliberately failed to warn the public, including Plaintiff and Plaintiff's physician, of the serious risk of injury and failure occasioned by the defects in the device;

d.     The Pinnacle Hip did not conform to the representations made by Defendants concerning the device; and

e.     Defendants' representations about the Pinnacle Hip did not conform to applicable federal requirements.

105.     Since Defendants are manufacturers of the Pinnacle Hip, they are held to the level of knowledge of an expert in the field of that type of prosthetic device and had a duty to warn consumers and physicians of the dangers associated with the device. Defendants failed to do so.

106.     At the time the subject Pinnacle Hip Defendants' control, Defendants supplied and manufactured a defective Pinnacle Hip with inadequate post-marketing warning or instruction because after Defendants knew or should have known of the risk of serious bodily harm, as set forth herein, Defendants failed to provide adequate warnings to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

107.     Had Plaintiff and/or Plaintiff's health care provider received proper or adequate warning as to the risks associated with the Pinnacle Hip, Plaintiff would not have used the product or had it implanted into his body.

108.     As a direct and proximate cause of Defendants' failure to warn, Plaintiff has suffered, and will continue to suffer injury, physical pain and suffering, disability, physical impairment, disfigurement, inconvenience, increased likelihood for additional revision surgeries, emotional distress, mental anguish, loss of the capacity for the enjoyment of life and medical nursing and surgical expenses.

## <u>COUNT VII - PUNITIVE DAMAGES UNDER COMMON LAW</u>

109.     Plaintiff repeats and incorporates by reference all other paragraphs of this Complaint and further alleges:

110.     Plaintiff is entitled to punitive damages because the Defendants' wrongful acts and/or omissions were wanton or in conscious disregard of the rights of others.  Defendants misled both the medical community and the public at large, including Plaintiff, by making false

representations about the safety and efficacy of the Pinnacle Hip and by failing to provide adequate instructions and training concerning its use.

111.    Defendants downplayed, understated, and/or disregarded their knowledge of the serious and permanent side effects and risks associated with the use of the Pinnacle Hip despite available information demonstrating that the Pinnacle Hip could loosen and separate, causing serious harm to patients. Such risks and adverse effects could easily have been avoided had Defendants not concealed knowledge of the serious risks associated with the Pinnacle Hip or provided proper training and instruction to physicians regarding the use of the Pinnacle Hip.

112.    Defendants were or should have been in possession of evidence demonstrating that the Pinnacle Hip cause serious side effects. Nevertheless, Defendants continued to market the Pinnacle Hip by providing false and misleading information with regard to its safety and efficacy.

113.    Defendants failed to provide warnings that would have dissuaded health care professionals from using the Pinnacle Hip, thus preventing health care professionals and consumers, including Plaintiff, from weighing the true risks against the benefits of using the Pinnacle Hip.

114.    Defendants failed to provide adequate training and instructions to physicians that could have prevented failure of the Pinnacle Hip causing serious harm and suffering to patients, including Plaintiff.

115.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered injury and Defendants are liable to Plaintiff in an amount to be determined at trial.

**WHEREFORE,** Plaintiff Matthew Laird prays for an award of damages in excess of the $75,000.00 jurisdictional amount of this Court against the Defendants jointly and severally as follows:

A.      All economic, special, and compensatory damages, past and future, recoverable by the Plaintiff;

B.      All non-economic and general damages, past and future, recoverable by the Plaintiff;

C.      Attorney's fees and costs;

D.      Treble damages;

E.      Punitive or exemplary damages as permitted by Virginia law;

F.      Prejudgment and post judgment interest; and

G.      Any and all further relief, both legal and equitable, that the Court may deem just and proper.


## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

DATED this ____15th_____day of __January___ 2020.

Respectfully submitted,

MATTHEW LAIRD


By_____/s/ Randall T. Trost_____
                        Counsel

Randall T. Trost, Esq. (VSB No.: 45942)
Randall J. Trost, P.C.
801 Main Street, 10th Floor
Lynchburg, Virginia 24504
Telephone: (434) 528-4222
Facsimile: (434) 847-0814
E-mail: rttrost@trostlaw.com